**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

**LEISA NETTLES**                                                                                    **PLAINTIFF**

**v.**                                        **Case No. 3:15-cv-00123-KGB**

**HYTROL CONVEYOR COMPANY, INC.**                                          **DEFENDANT**

<u>**OPINION AND ORDER**</u>

Before the Court is defendant Hytrol Conveyer Company, Inc.'s ("Hytrol") motion for summary judgment, to which plaintiff Leisa Nettles has responded (Dkt. Nos. 17; 24). Hytrol replied to Ms. Nettles' response by filing a reply, as well as a "rebuttal to facts disputed by plaintiff" (Dkt. Nos. 32; 31). Ms. Nettles filed a motion to strike Hytrol's "rebuttal to facts disputed by plaintiff" (Dkt. No. 33). To resolve the pending motion, the Court did not consider the information contained in Hytrol's rebuttal to facts disputed by plaintiff (Dkt. No. 31). Accordingly, Ms. Nettles' motion to strike is denied as moot (Dkt. No. 33). *See Moore v. City of Desloge, Mo.*, 647 F.3d 841, 849 (8th Cir. 2011) ("[R]ulings on motions to strike are committed to the district court's sound discretion.").

For the following reasons, the Court grants Hytrol's motion for summary judgment (Dkt. No. 17). Ms. Nettles' claims are dismissed with prejudice. All pending motions are denied as moot.

## I.     Background

Unless otherwise noted, the following facts are taken from Ms. Nettles' response to defendant's Local Rule 56.1(a) statement of undisputed facts (Dkt. No. 25). Ms. Nettles is a former employee of Hytrol, which manufactures material handling conveyers. She began working for Hytrol on January 10, 2011, as an employee on the paint line and was eventually

moved to the fabrication department in July of 2012. In October 2013, Ms. Nettles filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging gender discrimination. Four months later, in February 2014, Hytrol accepted Ms. Nettles' bid to move to a new fabrication position, which included the opportunity to drive a fork lift. On March 19, 2014, the EEOC issued a Dismissal and Notice of Rights regarding Ms. Nettles' initial Charge of Discrimination.

During this time, Ms. Nettles requested Family and Medical Leave Act ("FMLA") leave. Hytrol granted her request, and Ms. Nettles went on FMLA leave from March 13, 2014, to April 12, 2014. Ms. Nettles requested an extension of FMLA leave, and Hytrol granted her request. Ms. Nettles remained on FMLA leave until April 21, 2014, when she returned to work at the same job position without restriction.

The morning of May 2, 2014, team leaders Dave Weiblen and Wes Lowery observed Ms. Nettles climbing on a rack used to store sheets of steel to reach plans and paperwork on a higher shelf. There is no dispute that Ms. Nettles climbed on the rack that day, rather than using a ladder or forklift to retrieve the plans and paperwork. However, the parties dispute how high Ms. Nettles climbed on the rack: Hytrol claims that Ms. Nettles climbed six feet off the ground while Ms. Nettles, who is 5'2", claims that she only climbed to the second rung, "which is significantly shorter than her" (Dkt. No. 25, at 3). Mr. Lowery instructed Ms. Nettles to get down from the rack and not to climb it again because it was a safety hazard. He immediately reported the incident to his supervisor, Tommy Holmes, and documented the incident in writing on a notepad and in a formal desk note.

After speaking with Mr. Lowery, Mr. Holmes reported the incident to his supervisor, Chris Taylor, who reported the incident to David Joe Deaton, Hytrol's Human Resources

Manager.  Mr. Taylor and Mr. Deaton reported the incident to Chris Glenn, Hytrol's Director of Manufacturing.

Upon speaking with Mr. Taylor and Mr. Deaton, Mr. Glenn determined that further investigation was necessary.[1]  He spoke with Mr. Lowery, who witnessed Ms. Nettles climbing on the rack.  Mr. Lowery took Mr. Glenn to the rack and showed him a footprint that Ms. Nettles had purportedly left on the rack at a height of approximately six feet off the ground.  Ms. Nettles denies leaving a foot print at that height and claims that Mr. Glenn could not have seen that footprint, or that another employee was responsible for the footprint being there.

Hytrol follows a progressive disciplinary policy, but it reserves the right to terminate an employee on a first offense for conduct that it deems intolerable.  Hytrol has an employee guide, which includes safety rules.  The safety rules provide that employees are expected to work in a safe manner at all times.  Since being promoted to Director of Manufacturing, Mr. Glenn has terminated six employees, including Ms. Nettles, for committing safety violations.  Of these six employees, Ms. Nettles is the only woman.[2]

Ms. Nettles received Hytrol's employee guides throughout her employment and understood that she was required to work in a safe manner at all times.  Hytrol team leaders instruct employees to use a ladder or forklift to access paper orders that are not reachable from the ground.  A ladder and forklift were available to Ms. Nettles when she climbed on the rack.  Mr. Glenn claims that he decided to terminate Ms. Nettles because she "carelessly and needlessly

---

[1]  While Ms. Nettles disputes some aspects of Hytrol's response to this incident, she does not dispute that Mr. Glenn investigated Mr. Taylor and Mr. Deaton's report (Dkt. No. 25, at 5-6).

[2]  Ms. Nettles moves to strike the information concerning the other employees Mr. Glenn has immediately terminated for safety violations (Dkt. No. 25, at 11).  She argues that this information is not a material fact.  The Court disagrees; this information is material to the question of whether Hytrol's decision to terminate Ms. Nettles was motivated by her gender.  *See Henry v. Hobbs*, 824 F.3d 735, 740 (8th Cir. 2016) (considering similar information in determining whether an employer's decision was discriminatory).

committed a serious safety violation that put her at risk for death or serious bodily injury" (Dkt. No. 25, ¶ 20).[3]  Ms. Nettles disputes that Mr. Glenn was the sole decision maker for determining whether she would be terminated.  She contends that Mr. Deaton was also a decision maker and that he was also involved in making the decision to terminate her employment.

Ms. Nettles does not dispute that climbing on the rack presented safety risks to her health, though she disputes Hytrol's assertions about how high she climbed on the rack.  There is no dispute that the rack stores steel sheets and parts (Dkt. No. 25, at 6).  There is no dispute that death or serious bodily injury can occur from a fall (Dkt. No. 25, at 6).  There is no dispute that Ms. Nettles could have been cut by the sharp edges on the sheets of steel on the pallets below, had she lost her balance and fallen (Dkt. No. 25, at 6).  There is no dispute that Ms. Nettles was climbing between two racks, such that if she had fallen off the rack backwards she could have hit the rack holding steel behind her (Dkt. No. 25, at 6−7).  She also does not dispute that prior to the incident, she was instructed to use a ladder or forklift to reach paperwork to retrieve paper orders, rather than climbing on the shelves.  However, she contends that she believed that climbing on the racks to retrieve paperwork was permissible because a team leader had recently directed her to do so, she had never been trained not to climb, and there was nothing in writing regarding not climbing on the racks.

The alleged safety violation occurred on Friday, May 2, 2014.  The following Monday and Tuesday, Ms. Nettles was on bereavement leave and was not at work.  On Wednesday, she was absent.  She returned to work on Thursday, May 8, 2014.  That morning, she met with Mr. Glenn.  Mr. Taylor, Mr. Deaton, and Mr. Holmes were present at the meeting.  During the meeting, Mr. Glenn terminated Ms. Nettles.  Mr. Glenn told Ms. Nettles that she was being

---

[3]   Ms. Nettles disputes the sincerity of Mr. Glenn's statement, but not that this was Hytrol's asserted basis for her termination (Dkt. No. 25, at 7).

terminated for committing a safety violation that could have caused her death or serious bodily injury.  Mr. Glenn was not aware that Ms. Nettles had recently taken FMLA leave when he terminated her on May 2, 2014.[4]  Hytrol eventually replaced Ms. Nettles with a man named Jason Williams who had not previously taken FMLA leave or filed a Charge of Discrimination with the EEOC (Dkt. No. 24-4, at 2).

## II.    Standard of Review

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable

---

[4]  Ms. Nettles attempts to dispute this fact by arguing that Mr. Deaton knew about the FMLA leave, that he spoke with Mr. Glenn about her during the termination process, and that "[o]ne possible inference is that Deaton told Glenn about the FMLA leave" (Dkt. No. 25, at 13-14).  She does not offer any record evidence to substantiate this assertion.

inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### III.    Discussion

Ms. Nettles brings disability discrimination, gender discrimination, and various retaliation claims against Hytrol.  Hytrol moves for summary judgment on all of her claims. Alternatively, Hytrol moves for summary judgment on Ms. Nettles' claims for front pay, reinstatement, and punitive damages.

### A.    Alleged Disability Discrimination

Ms. Nettles alleges that Hytrol discriminated against her based on a disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*  Hytrol moves for summary judgment on Ms. Nettles' disability discrimination claim because Ms. Nettles "conceded in her deposition that she does not believe that she was treated differently or terminated by Hytrol because of a disability" (Dkt. No. 18, at 5).  In response, Ms. Nettles argues that this "concession" is not dispositive because she was simply admitting that she is not actually disabled and that her ADA claim is not premised on an actual disability, but instead it is premised on a perceived disability.  Ms. Nettles contends that "[s]he had a health issue, which turned out to be hernias," and that this health issue, coupled with the fact that she had to take FMLA leave, was "a factor in her termination" (Dkt. No. 26, at 10).  Ms. Nettles was on FMLA leave for her hernias from March 13, 2014, to April 21, 2014, after which she returned to work without restrictions (Dkt. No. 25, ¶ 31).

To obtain relief for discrimination under the ADA, Ms. Nettles must make a *prima facie* showing that she:  (1) is a qualified individual under the ADA; (2) suffered discrimination as the term is defined by the ADA; and (3) the discrimination was based on disability as defined by the

ADA. *Brown v. City of Jacksonville*, 711 F.3d 883, 888 (8th Cir. 2013). Under Paragraph (1)(C) of the ADA, the term "disability" includes those who are regarded as having a physical or mental impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(1). However, the ADA specifically provides that "Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102 (3)(B).

In this case, Ms. Nettles went on FMLA leave for issues related to her hernias for a little over one month in 2014 and returned to work without restrictions. Her condition was a transitory impairment as defined by the ADA because the actual duration of the injury was less than six months. There is no record evidence before the Court to establish an inference that anyone from Hytrol believed Ms. Nettles' condition would last six months or more in duration. Therefore, she cannot qualify as being "regarded as disabled" for the purposes of the ADA. *See Horsham v. Fresh Direct*, 136 F. Supp. 3d 253, 263–64 (E.D.N.Y. 2015) (finding that plaintiff failed to state a claim that he was regarded as being disabled for the purposes of the ADA where the plaintiff was given approximately four and a half months off from work after hernia surgery because "these facts do not support an inference that Defendant believed that Plaintiff's impairment would last longer than six months"). Ms. Nettles conceded that she was not actually disabled during her deposition. The Court determines that she does not qualify as being disabled in any sense for the purposes of her ADA claim. Accordingly, even if Ms. Nettles did not waive this claim based on her deposition testimony, the Court finds that Hytrol is entitled to summary judgment on Ms. Nettles' claim for disability discrimination under the ADA.

B.      **Alleged Gender Discrimination**

Ms. Nettles claims that Hytrol discriminated against her based on her gender, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, and the Arkansas Civil Rights Act ("ACRA"), Ark. Code Ann. § 16-123-101 *et seq.* (Dkt. No. 1, at 4-5). Hytrol argues that it is entitled to summary judgment on Ms. Nettles' gender discrimination claims for two reasons:  (1) Ms. Nettles cannot state a *prima facie* case of gender discrimination; and (2) even if she could, she cannot establish that Hytrol's nondiscriminatory reason for terminating her was merely a pretext.[5]

Title VII and ACRA claims are governed under the same standard.  *See, e.g.*, *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860 (8th Cir. 2009).  An employment discrimination plaintiff may survive a motion for summary judgment through "proof of 'direct evidence' of discrimination . . .  [or] through the *McDonnell Douglas* analysis, including sufficient evidence of pretext."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1044 (8th Cir. 2011); *see also McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  The Court will analyze Ms. Nettles' claim under the *McDonnell Douglas* format, as she does not offer direct evidence of discrimination.

---

[5]  The record does not indicate whether Ms. Nettles filed a Charge of Discrimination with the EEOC within 180 days of being terminated from Hytrol, meaning that she has conceivably procedurally defaulted her Title VII claims.  *See Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 (8th Cir. 2006) ("A Title VII plaintiff must exhaust administrative remedies before bringing suit in federal court. A claimant must first timely file an administrative charge with the EEOC."). However, exhaustion does not appear to be a jurisdictional requirement, and it may be waivable. *See Davis v. Kansas City Housing Authority*, 822 F. Supp. 609, 618 (W.D. Mo. 1993) (concluding that the timely filing of an EEOC charge is not jurisdictional).  Hytrol did not raise the issue of exhaustion in its motion for summary judgment (Dkt. No. 17).  Therefore, the Court will proceed to the merits of Ms. Nettles' Title VII claims without making a determination as to whether her claims are procedurally defaulted.

The United States Supreme Court's decision in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), established the burden-shifting framework used to analyze employment discrimination claims. "Under this scheme, a plaintiff first must establish a prima facie case of discrimination . . . ." *Wilking v. County of Ramsey*, 153 F.3d 869, 872 (8th Cir. 1998). If Ms. Nettles establishes a *prima facie* case, then the burden shifts to Hytrol to articulate a legitimate, non-discriminatory reason for the action. *Tyler v. Univ. of Ark. Bd. of Trustees*, 628 F.3d 980, 990 (8th Cir. 2011). If Hytrol meets its burden, the burden shifts back to Ms. Nettles to present facts that, if proven at trial, would permit a jury to conclude that Hytrol's proffered reason was a pretext and that unlawful discrimination was the true reason for the adverse employment action. *Id.*

### 1.     *Prima Facie* Case

To establish a *prima facie* case of discrimination under Title VII or the ACRA, Ms. Nettles must show that:  (1) she is a member of a protected class; (2) she was meeting her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently or there are facts permitting an inference of discrimination. *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 716 (8th Cir. 2012); *Canady v. Wal-Mart Stores, Inc.*, 440 F.3d 1031, 2034 (8th Cir. 2006). Hytrol does not contest that Ms. Nettles satisfies the first three elements of the *prima facie* case, but Hytrol argues that she "cannot present competent proof that gives rise to an inference of gender discrimination" (Dkt. No. 18, at 6). In response, Ms. Nettles argues that she can satisfy the fourth element of her *prima facie* case "by establishing replacement, disparate treatment, or through evidence of pretext" (Dkt. No. 26, at 15).

In a gender discrimination case, a plaintiff can satisfy the fourth element of the *prima facie* case by showing that she was replaced by someone of the opposite gender. *Kobrin v. Univ. of Minnesota*, 34 F.3d 698, 702 (8th Cir. 1994) ("In sex discrimination cases, the [female] plaintiff makes out a prima facie case by proving: . . . (4) that the employer hired a man for the position."); *see also  Hill v. St. Louis Univ.*, 123 F.3d 1114, 1119 (8th Cir. 1997) ("Under the burden-shifting framework, Hill must establish the elements of a prima facie case: (1) that she is within the protected class of people; (2) that she was qualified to perform her job; (3) that her employment was terminated; and (4) after her dismissal, she was replaced by someone younger (ADEA) or of the opposite gender (sex discrimination under Title VII)."). Ms. Nettles was replaced by a man, though there is record evidence that Hytrol posted the job position internally and current Hytrol employees were permitted to bid on the job (Dkt. No. 32, at 11). According to its practice, Hytrol accepted the bid of the Hytrol employee who had the most seniority (Dkt. No. 32, at 11). In other words, none of the decision makers involved in terminating Ms. Nettles selected a male candidate to fill her position; instead, the most senior Hytrol employee to bid on the open position received it. However, even if Ms. Nettles could establish a *prima facie* case, the Court finds that she fails to satisfy her remaining burdens under the *McDonnell Douglas* framework.[6]

---

[6]   The Court notes that the fact that Ms. Nettles was replaced by a man is insufficient to demonstrate pretext.   *See Pottenger v. Potlatch Corp.*, 329 F.3d 740, 748 (9th Cir. 2003) ("Without more . . . the fact that Nelson was younger than Pottenger does not create a triable issue of pretext."); *Dunaway v. Int'l Bhd. of Teamsters,* 310 F.3d 758, 767 (D.C.Cir. 2002) ("The Teamsters' decision to replace her with a younger woman is insufficient for a jury to conclude that she lost out *because of [her] age.*" (quotation marks omitted)); *Cianci v. Pettibone Corp.*, 152 F.3d 723, 727 (7th Cir. 1998) ("While Cianci also points to her replacement by a male as evidence of gender discrimination, this is simply insufficient to demonstrate that Cianci's gender motivated the decision to terminate her.").

## 2.     Hytrol's Burden To Show Nondiscriminatory Reason

Assuming without deciding that Ms. Nettles makes a *prima facie* case of gender discrimination, the burden shifts to Hytrol to articulate a nondiscriminatory justification for its decision to terminate Ms. Nettles.  Hytrol's burden "is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Floyd v. State of Mo. Dep't of Soc. Servs., Div. of Family Servs.,* 188 F.3d 932, 936 (8th Cir.1999).   In this case, Hytrol claims that Ms. Nettles was terminated for violating its safety rules by climbing on a rack holding sheets of steel. Hytrol reserves the right to terminate employees for conduct that it deems intolerable.   While Ms. Nettles disputes how high she climbed, she concedes that she climbed on the rack on the day in question and that her actions posed a risk to her safety.   A violation of company policy is a legitimate reason for termination.  *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003).    Therefore, the Court finds that Hytrol meets its burden of articulating a nondiscriminatory justification for its decision to terminate Ms. Nettles.

### 3.     Pretext

Under *McDonnell Douglas*, the burden shifts back to Ms. Nettles to establish that Hytrol's safety-based justification for her termination is a pretext for gender based discrimination.  Ms. Nettles "may demonstrate pretext either by showing 'that the employer's explanation is unworthy of credence because it has no basis in fact' or 'by persuading the court that a prohibited reason more likely motivated the employer.'" *Cox v. First Nat. Bank*, 792 F.3d 936, 939 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1047).   She offers three sources of evidence to meet this burden:  "(1) comparators who were under the same decision-makers, the same standards, and committed acts of similar seriousness; (2) falsehoods; and (3) shifting explanations for their conduct" (Dkt. No. 26, at 16).

11

### a.    Comparators

"At the pretext stage, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Bone v. G4S Youth Servs., LLC,* 686 F.3d 948, 956 (8th Cir.2012) (internal quotation marks omitted)).  Ms. Nettles must show "that she and the employees outside of her protected group were similarly situated in all relevant respects[,]" meaning they "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* (internal quotation marks omitted).  As Ms. Nettles' discrimination claim is based on disciplinary action, "[t]o be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness." *Id.* (alteration in original) (internal quotation marks omitted).

Ms. Nettles identifies 11 potential comparators (Dkt. No. 26, at 5-8).  Hytrol argues that none of these individuals are valid comparators because they were not disciplined by Mr. Glenn. Ms. Nettles counters by essentially arguing the "cat's paw" theory of liability, where an employer is liable "[i]f a non-decision-maker performs an act motivated by a discriminatory bias that is intended to cause, and that does proximately cause, an adverse employment action." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1075 n.6 (8th Cir. 2011).  She claims that Mr. Deaton acted as a "gatekeeper," meaning he reported Ms. Nettles' conduct to Mr. Glenn so that she would be fired, but she contends that he did not report the equivalent conduct of her proposed comparators (Dkt. No. 26, at 18).

The Eighth Circuit Court of Appeals has questioned whether the cat's paw theory of liability may be used for "claims pursued through the *McDonnell Douglas* burden-shifting framework." *Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1152 (8th Cir. 2011).  Assuming without deciding that Ms. Nettles can bring her claims using the cat's paw theory, the Court finds

that her claims fail for several reasons even when all of the record evidence is viewed in the light most favorable to Ms. Nettles.

As an initial matter, the following facts are undisputed.  Upon receiving a report from Mr. Taylor and Mr. Deaton that Ms. Nettles was seen climbing on a steel rack, Mr. Glenn conducted an independent investigation of the facts (Dkt. No. 25, ¶¶ 13-14).  As part of this investigation, he spoke with Mr. Lowery, who witnessed the incident and was Ms. Nettles' team leader.  Mr. Lowery took Mr. Glenn to the rack that Ms. Nettles had climbed.  Mr. Glenn testified in his deposition that he saw a footprint on the rack about six feet off the ground, consistent with Mr. Lowery's report.  Excluding Ms. Nettles, Mr. Glenn has terminated five employees for safety violations.  All of these employees were men.

Mr. Glenn conducted an independent review of the allegations made against Ms. Nettles. When considering a cat's paw theory of liability, while "an independent review by the ultimate decisionmaker does not necessarily resolve the causation issue in the employer's favor[,]" it can be considered in determining whether that decisionmaker's decision was "untainted." *Id.*  Ms. Nettles admits that she climbed on the steel rack, at risk to her safety.  She admits that Hytrol employees can be terminated for committing safety violations, and she does not dispute that Mr. Glenn has terminated other employees for committing safety violations.  She admits that Mr. Glenn investigated the allegations against her.  "[A] plaintiff 'cannot establish a causal link between the alleged discriminatory animus and the' adverse employment action if the same result would have occurred regardless of the animus." *Id.* at 1153 (quoting *E.E.O.C. v. Con–Way Freight, Inc.,* 622 F.3d 933, 936 (8th Cir. 2010)).  Under these circumstances, no reasonable fact finder could conclude that Mr. Deaton's discriminatory animus (assuming he had one) motivated Mr. Glenn to terminate Ms. Nettles' employment.  Mr. Glenn conducted an independent review

of the allegations and made the decision to terminate for committing a safety violation.  Ms. Nettles does not deny she committed a safety violation.  Therefore, Ms. Nettles cannot use the cat's paw theory of liability to satisfy her burden that Hytrol's alleged safety-based decision to fire her was pretext for gender discrimination.

Ms. Nettles argues that it is impossible that Mr. Glenn saw her footprint on the rack six feet off the ground because she did not climb that high (Dkt. No. 25, at 6).  She claims that either Mr. Glenn is lying about seeing the footprint or "others" left the footprint on the rack to set her up (*Id.*).  Neither of these arguments precludes summary judgment.  While the Court must view all facts and inferences from those facts in a light most favorable to Ms. Nettles, the Court is not required to speculate that Mr. Glenn is lying about seeing the footprint.  *See Kaminsky v. Saint Louis Univ. Sch. of Med.*, No. 4:05 CV 1112 CDP, 2006 WL 2376232, at *10 (E.D. Mo. Aug. 16, 2006), *aff'd*, 226 F. App'x 646 (8th Cir. 2007).  Furthermore, even if Ms. Nettles was "set up," Hytrol remains entitled to summary judgment because there is no evidence that Mr. Glenn did not honestly believe at the time he terminated Ms. Nettles that she climbed six feet high on the rack.  *See Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012) ("[E]ven if the business decision was ill-considered or unreasonable, provided that the decisionmaker honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist.") (quoting *Little v. Illinois Department of Revenue,* 369 F.3d 1007, 1012 (7th Cir. 2004)).

Hytrol argues that only Mr. Glenn made the decision to terminate Ms. Nettles.  Ms. Nettles maintains that Mr. Deaton was involved in that decision under the cat's paw theory.  Ms. Nettles focuses on Mr. Deaton, but the undisputed record evidence establishes that the following supervisors were involved at various stages in reporting the incident involving Ms. Nettles.  Mr.

Holmes, who is a facilitator and who, based on the record evidence with all inferences drawn in favor of Ms. Nettles, may be involved in giving advice on discipline, reported the incident to his supervisor, Focus Factory Manager Mr. Taylor (Dkt. No. 25, at 4, ¶ 11; Dkt. No. 25-1, at 18). Mr. Taylor, who is a manager and who, based on the record evidence with all inferences drawn in favor of Ms. Nettles, also may be involved in giving advice on discipline, reported the incident to Mr. Deaton (Dkt. No. 25, at 4, ¶ 11; Dkt. No. 25-1, at 18−19)). Mr. Taylor and Mr. Deaton reported the incident to Mr. Glenn (*Id.*). Mr. Deaton testified that he and the manager together make the decision to report an incident to Mr. Glenn (Dkt. No. 25-1, at 73). In fact, Mr. Deaton testified as follows:

> Q.   So if HR is involved in helping to determine what discipline somebody should receive, it would be you or years ago, Ms. Logsdon, is that right?
>
> A.   Yes, sir.
>
> Q.   And how did –
>
> A.   Can I back up just a second?
>
> Q.   Yes, sir.
>
> A.   The discipline up to termination. Termination I don't make that decision to terminate.
>
> Q.   Who does?
>
> A.   It will either be their manager will make that decision to terminate or the vice president of that area would make that decision to terminate.
>
> Q.   Okay. And so when it's a termination decision – when it's a termination decision, do y'all, I mean, does the manager or vice president get your advice even if you're not making the decision?
>
> A.   He might include us in a discussion, but ultimately he will make that decision to terminate.
>
> Q.   Of course, one thing about it is, I imagine there's time when somebody gets terminated but it's not like a predetermined result. Like y'all think

about it and you're deciding how serious the discipline should be, but you're not necessarily coming in, we're going to fire this person no matter what?

A.      I'm not sure I'm following you here now.

Q.      You know, well, I'm just – it's kind of a chicken or the egg problem I'm getting at, I guess.  Is because it sounds like normally you and the employee's manager would be involved in determining how serious the discipline should be?

A.      Yes, sir.

Q.      And but you're saying that when it's a termination thing that it's the manager or the VP that makes the decision?

A.      Yes, sir.  Most of the terminations are the VP, if he's in house.  Now if he's on vacation or off somewhere, those managers will step in and get involved.  Most of the ones that he's there, he is involved with.

Q.      Okay.  And is the VP usually involved in decisions that are less serious than termination?

A.      Not necessarily, no.

Q.      He might be, but he might not be?

A.      Might be but might not be.

Q.      Okay.  And the manager, are they usually involved in decisions?

A.      That manager will be involved with the most of the time.  Yes, sir.

(Dkt. No. 25-1, at 8−10).

Even if this Court opts to examine the cat's paw theory as applied to this case, the Court finds that Ms. Nettles' proposed comparators are not similarly situated to her to satisfy her burden of demonstrating pretext.  Ms. Nettles points to 11 individuals whom she contends are appropriate comparators:   Zachary Collins, Justin Curtis, Thomas Gerber, Lamont Williams, Gregory Chaffin, Deidre Godfrey, Jack Taylor, Les Williams, Barry Foster, Hollis Bowden, and PJ Glasco (Dkt. No. 26, at 5−8).

Jack Taylor, Les Williams, Barry Foster, Hollis Bowden, and PJ Glasco are not valid comparators because Mr. Deaton and Mr. Glenn were not their supervisors when they were disciplined.  Mr. Glenn was promoted to his current position in September 2012 (Dkt. No. 26, at 8; Dkt. No. 32, at 5).  Mr. Deaton was promoted to Human Resources Manager in January 2013 (Dkt. No. 25-1, at 3, 73).  As these men were disciplined prior to September 2012, they are not valid comparators to Ms. Nettles.

Of those proposed comparators disciplined after those dates, upon examination of the undisputed facts underlying their situations, none are sufficiently similarly situated to Ms. Nettles to establish pretext.

One of these individuals, Deidre Godfrey, is not a valid comparator for Ms. Nettles' gender discrimination claim because she is a woman.  *Mann v. Frank*, 7 F.3d 1365, 1370 (8th Cir. 1993) ("Mann cannot state a prima facie case of disparate treatment on the basis of religion by comparing her treatment to that of a member of the same protected class.").  Ms. Godfrey is also not a valid comparator for the purpose of Ms. Nettles' retaliation claims.  Ms. Nettles claims that Ms. Godfrey "was disciplined in February 2015, for holding a part in her hand and die grinding paint off the hole in the part" (Dkt. No. 26, at 7).  Ms. Nettles produces no record evidence demonstrating that this infraction was similarly serious to climbing on a steel rack.  She has the burden of establishing that Ms. Godfrey is similarly situated to her in all relevant respects.  These unsubstantiated allegations are insufficient to meet her burden.  *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004).

Zachary Collins, Justin Curtis, Thomas Gerber, and Lamont Williams are not valid comparators to Ms. Nettles because they received discipline from their immediate supervisors, not Mr. Deaton or Mr. Glenn (Dkt. No. 32, at 7-9).  Further, their immediate supervisors were

different from Ms. Nettles' immediate supervisor.  Mr. Collins, Mr. Curtis, Mr. Gerber, and Mr. Williams all received written warnings for their infractions from their immediate supervisors.  In each case, Mr. Deaton signed the written warnings *after* the employees were disciplined.  There is no record evidence that Mr. Glenn or any of the other individuals who supervised Ms. Nettles were included in the decision to discipline these employees.  Therefore, the Court finds that these men are not similarly situated to Ms. Nettles.

Finally, Gregory Chaffin is not a valid comparator.  Mr. Chaffin received a written reminder from his immediate supervisor Rick Stevens after climbing on his work cart to adjust his fan (Dkt. No. 26, at 7).  Mr. Chaffin was 37 inches off the floor.  He and Ms. Nettles did not share immediate supervisors.  Further, Mr. Deaton testified that he and then-Hytrol manager Jerry Besheirs made the decision not to take the incident to Mr. Glenn because they did not believe the conduct was serious enough to cause bodily injury (Dkt. No. 25-1, at 97:11-13; 97:22 −98:2).  Hytrol argues, and the Court agrees, that this is not of comparable seriousness to what Mr. Deaton and Mr. Glenn believed Ms. Nettles did:  climb six feet off the floor on a rack holding sheets of steel, approximately double the height that Mr. Chaffin was from the floor. [7] Moreover, based on the undisputed record evidence, Mr. Chaffin and Ms. Nettles did not share the same supervisors.  Neither Rick Stevens nor Jerry Besheirs was involved in the decision to discipline Ms. Nettles.  To be a proper comparator, the individual "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."  *Bone,* 686 F.3d at 956.  For these reasons, Mr. Chaffin is not a valid comparator.

---

[7] Again, there is no evidence in the record showing that this belief was dishonest.  *See Pulczinski*, 691 F.3d at 1003 ("[E]ven if the business decision was ill-considered or unreasonable, provided that the decisionmaker honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist.").

Ms. Nettles raises an argument against summary judgment in relation to these comparators. She claims that Mr. Deaton and Mr. Glenn testified during their depositions that "it is normal practice to inform Glenn of such [safety risk] situations, and for termination to occur[,]" meaning "[a] reasonable jury could infer from that evidence that normal practice was followed, and Glenn did know about [Ms. Nettles' proposed comparators]" (Dkt. No. 26, at 17). Based on this purported "inference," Ms. Nettles argues that summary judgment is improper because either "the basis for a distinction between Plaintiff and those comparators ceases to exist[,]" or "Glenn and Deaton were deceptive about that issue, which is evidence of pretext" (*Id.*). The Court rejects this argument, as Ms. Nettles "must substantiate [her] allegations with sufficient probative evidence that would permit a finding in [her] favor on more than mere speculation, conjecture, or fantasy." *Rickard v. Swedish Match N. Am., Inc.*, 773 F.3d 181, 184 (8th Cir. 2014), *cert. denied*, 135 S. Ct. 2844, 192 L. Ed. 2d 876 (2015) (quoting *Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994)). The only evidence in the record is that Mr. Deaton did not involve Mr. Glenn in disciplining Ms. Nettles' proposed comparators. Ms. Nettles does not identify any disputed facts demonstrating anything to the contrary. Further, even drawing this inference will not overcome the record evidence that other supervisors and managers were involved in the incidents with the purported comparators, not the same supervisors and managers as involved in Ms. Nettles' case.

For all of these reasons, the Court finds that Ms. Nettles fails to satisfy her burden of showing pretext through the use of comparators.

### b.    Falsehoods And Shifting Explanations

Ms. Nettles also claims that she can establish pretext through "false statements" and "shifting explanations" (Dkt. No. 26, at 16). "The falsity of a nondiscriminatory basis for the

19

employment action may . . . support a finding of pretext—'[I]f the proffered reason is shown by conflicting evidence to be untrue, then the nonmoving party is entitled to all favorable inferences that the false reason given masks the real reason of intentional discrimination.'" *Loeb v. Best Buy Co.*, 537 F.3d 867, 873 (8th Cir. 2008) (quoting *Bassett v. City of Minneapolis,* 211 F.3d 1097, 1107 (8th Cir.2000)).  A plaintiff can also show pretext "with evidence that the employer's reason for the termination has changed substantially over time." *Id.*

Ms. Nettles attempts to establish pretext by claiming that Mr. Deaton's testimony regarding her proposed comparators shifted throughout his deposition (Dkt. No. 26, at 17-18). Ms. Nettles misunderstands the type of "shifting explanations" that are required to show pretext. Ms. Nettles could demonstrate pretext by showing that Hytrol's asserted reason for *her termination* has shifted over time. *Bone*, 686 F.3d at 957 ("A change in an employer's legitimate, nondiscriminatory reason *for firing an employee* is probative of pretext . . . .'") (emphasis added).   The Eighth Circuit Court of Appeals has explained why evidence of shifting explanations for an adverse employment action is a proper way to demonstrate pretext:

> When an employer has offered different explanations for an adverse employment action and when evidence has been presented that would allow a reasonable trier of fact to disbelieve each explanation, the trier of fact may reasonably infer that the employer is hiding something—that is, that the true explanation is unlawful discrimination.

*Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1024 (8th Cir. 1998).  Ms. Nettles offers no evidence showing that Hytrol ever claimed that Ms. Nettles was terminated for anything other than climbing on the steel rack.  The "shirting explanations" she identifies are unrelated to Hytrol's decision to terminate her employment.

The Court also finds that Ms. Nettles has failed to establish pretext through showing "falsehoods."  Ms. Nettles attempts to argue that the Court must assume that Mr. Deaton and Mr.

Glenn lied about:  (1) Mr. Glenn not being involved in the disciplinary decisions of her proposed comparators; and (2) Mr. Glenn seeing Ms. Nettles' footprint on a rung six feet off the ground (Dkt. No. 26, at 17-19).  For reasons previously stated, the Court rejects Ms. Nettles' argument that it must infer that Mr. Deaton and Mr. Glenn gave false testimony regarding these issues.  Accordingly, the Court finds that Ms. Nettles fails to meet her burden of showing that Hytrol's safety-based decision to terminate her was pretext.

### C.      Retaliation

Ms. Nettles claims that Hytrol retaliated against her for taking FMLA leave and for filing an EEOC charge.  Hytrol moves for summary judgment on both of Ms. Nettles' retaliation claims.

### 1.      FMLA

There are three types of FMLA claims.  *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012).  The first type of FMLA claim, labeled an entitlement or interference claim, occurs when an employer takes action to avoid responsibilities under the FMLA such as refusing to authorize leave, discouraging an employee from taking such leave, or chilling an employee's willingness to take FMLA leave by attaching negative consequences to the exercise of those rights.  *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006).  The second type, labeled a retaliation claim, occurs when an employer takes an adverse action against an employee for opposing any practice made unlawful under the FMLA.  *Brown v. City of Jacksonville,* 711 F.3d 883, 890 (8th Cir.2013) (citing *Pulczinski*, 691 F.3d at 1005; *Lovland v. Emp'rs Mut. Cas. Co.,* 674 F.3d 806, 811 (8th Cir.2012)).  The third type, labeled a discrimination claim, occurs when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA.  *Id.*

Ms. Nettles brings an FMLA discrimination claim against Hytrol, as she claims that she was fired for taking FMLA leave. An employee alleging a FMLA discrimination claim "must prove that the employer was motivated by the employee's exercise of rights under the FMLA." *Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 866 (8th Cir. 2015) (citing *Pulczinski*, 691 F.3d at 1006). Without direct evidence of discrimination, a FMLA discrimination claim is "analyzed under the *McDonnell Douglas* framework." *Id.* Ms. Nettles must "show that she exercised rights afforded by the Act, that she suffered an adverse employment action, and that there was a causal connection between her exercise of rights and the adverse employment action." *Phillips v. Mathews,* 547 F.3d 905, 912 (8th Cir. 2008) (quoting *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 832 (8th Cir. 2002)). If Ms. Nettles "establishes a prima facie case, 'the burden shifts to the [employer] to articulate a legitimate, nondiscriminatory reason for its challenged actions.' The employee must then demonstrate that the proffered reason is pretext, showing that 'the employer's proffered explanation is unworthy of credence' or 'persuading the court that a prohibited reason more likely motivated the employer.'" *Hudson*, 787 F.3d at 866 (alterations in original) (citations omitted).

Hytrol does not dispute that Ms. Nettles can satisfy the first two prongs of her *prima facie* case, as she took FMLA leave and was later fired. However, Hytrol argues that Ms. Nettles cannot establish that she was fired because she took FMLA leave. In response, Ms. Nettles argues that she can show causation through the use of comparators. For the reasons previously stated, the Court finds that Ms. Nettles' proposed comparators are not similarly situated to her in all relevant respects. She also claims that causation can be inferred from the close temporal proximity between her taking FMLA leave and being terminated.

In certain circumstances, the temporal proximity between protected activity and a materially adverse employment action can be sufficient to establish causation for a *prima facie* case. *Gibson v. Geithner*, 776 F.3d 536, 541 (8th Cir. 2015) (retaliation under Title VII). However, a plaintiff generally must show more than temporal proximity alone. *Lors v. Dean*, 746 F.3d 857, 865 (8th Cir. 2014).  One way that a plaintiff can "supply the extra quantum of evidence to satisfy the causation requirement" is to show a "pattern of adverse actions that occur just after protected activity." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002). Absent a pattern, a plaintiff can still establish causation based on temporal proximity, but "[t]emporal proximity between the protected conduct and adverse action 'must be very close' for timing alone to be sufficient." *Lors*, 746 F.3d at 865 (quoting *Sisk v. Picture People, Inc.,* 669 F.3d 896, 900 (8th Cir.2012)).  In this case, Ms. Nettles was accused of violating Hytrol's safety rules on May 2, 2014, almost two months after she went on FMLA leave and less than two weeks after she returned to work from FMLA leave.  She was fired on May 8, 2014, the first day she returned to work after the accusation was made.  Ms. Nettles argues that the temporal proximity between when she returned to work from FMLA leave and the decision to terminate her is enough to satisfy her *prima facie* case.

The Court questions whether, on this record evidence, Ms. Nettles can establish her *prima facie* case of FMLA retaliation.  There is no dispute that Mr. Glenn was unaware that Ms. Nettles recently took FMLA leave prior to making his decision to terminate her, meaning if Mr. Glenn was the sole decision maker Ms. Nettles cannot demonstrate that there was a causal connection between her taking leave and her termination (Dkt. No. 25, at 13).   The Court acknowledges that Ms. Nettles argues that Mr. Deaton was aware that she went on FMLA leave and that she claims he played a role in the decision to terminate her.  Even accepting this

argument as true, the Court observes that the temporal proximity may not be close enough; in other words, the time interval between when Ms. Nettles *went on* FMLA leave and when she was accused of climbing on the steel rack is likely too large to satisfy her *prima facie* case requirements.[8]  The Eighth Circuit has implied that a period of almost two months is too long to support a finding of causation alone.  *See Kipp v. Missouri Highway & Transp. Comm'n.*, 280 F.3d 893, 897 (8th Cir. 2002) (finding that a two month interval "between the complaint and [plaintiff's] termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in Ms. Kipp's favor on the matter of causal link.").

The Court does not need to determine as a matter of law whether Ms. Nettles satisfies her *prima facie* case on this record evidence.  Even if she does, she remains required to show how Hytrol's legitimate, safety-based justification for her termination was pretext for retaliation.  Ms. Nettles relies on the same arguments for pretext that she made in relation to her gender discrimination claim.  Accordingly, the Court finds that Ms. Nettles fails to meet her burden of showing pretext for her FMLA retaliation claim, meaning Hytrol is entitled to summary judgment on this claim.

### 2.   Retaliation For Filing An EEOC Charge

Ms. Nettles also claims that she was terminated for filing a Charge of Discrimination with the EEOC in October 2013, in violation of Title VII, the ACRA, and the ADA.  For reasons previously stated, the Court finds that Ms. Nettles does not qualify for protection under the ADA.

---

[8] Ms. Nettles incorrectly argues that the date for determining temporal proximity to establish causation is the day she returned from FMLA leave.  The appropriate date is "the date an employer knew of an employee's use (or planned use) of FMLA leave, not the date it ended." *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012).

"To establish a *prima facie* case of retaliation under Title VII and the ACRA, a plaintiff must show that he engaged in statutorily protected conduct, that defendants took an adverse employment action against him, and that there was a causal link between the two actions." *McCullough v. Univ. of Arkansas for Med. Scis.*, 559 F.3d 855, 864 (8th Cir. 2009) (citing *Wallace v. Sparks Health Sys.,* 415 F.3d 853, 858 (8th Cir. 2005)).  If a plaintiff makes her *prima facie* case, "the burden shifts to the employer to proffer a legitimate, non-retaliatory basis for the adverse employment action."  *Id.*  "The plaintiff then bears the burden of proving that the employer's proffered reason was a mere pretext for a retaliatory motive."  *Id.*

Even assuming Ms. Nettles can establish her *prima facie* case of retaliation, she relies on the same arguments for pretext that she raises in conjunction with her gender discrimination and FMLA retaliation claims.  The Court rejects these arguments.  Accordingly, the Court finds that Hytrol is entitled to summary judgment on her Title VII and ACRA retaliation claims.

### D.    Alternative Arguments

Hytrol argues alternatively that the Court should dismiss Ms. Nettles' claims for front pay, reinstatement, and punitive damages.  As Hytrol is entitled to summary judgment on all of Ms. Nettles' claims, the Court will not address these issues or alternative arguments.

### IV.    Conclusion

Hytrol's motion for summary judgment is granted (Dkt. No. 17).  Ms. Nettles' claims are dismissed with prejudice.  All pending motions, including Ms. Nettles' motion to strike rebuttal (Dkt. No. 33), are denied as moot.

So ordered this 9th day of September, 2016.

_____
Kristine G. Baker
United States District Judge

25